IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHERYL A. KERNS,**           Case No. 1:18 CV 1187

    Plaintiff,           Chief Judge Patricia A. Gaughan

    v.           Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.           REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Cheryl A. Kerns ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated May 23, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in March 2012, alleging a disability onset date of June 1, 2009. (Tr. 196-98). Her claims were denied initially and upon reconsideration. (Tr. 110-13, 128-30). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 135-36). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 12, 2014. (Tr. 32-65). On December 9, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-26). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed a timely complaint against the Commissioner on May 25, 2016 in the Northern District of Ohio. *See Kerns v. Comm'r of Soc. Sec.*, Case No. 1:16-cv-1264 (N.D. Ohio) (Doc. 1). On November 4, 2016, the parties filed a joint motion to remand the case, *see id.* at Doc. 16, which the Court granted, *id.* at Doc. 18; Tr. 1073.

Plaintiff (again represented by counsel) and a VE testified at a remand hearing before the ALJ on July 19, 2017. (Tr. 971-1019). On September 6, 2017, the ALJ again found Plaintiff not disabled in a written decision. (Tr. 941-53). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 924-29); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on May 23, 2018. (Doc. 1).

**FACTUAL BACKGROUND**[1]

Personal Background and Testimony

Plaintiff was born in July 1967, making her 41 years on her alleged onset date. (Tr. 68). She alleged disability due to depressive disorder, opiate induced mood disorder, asthma, obesity, scoliosis, and chronic obstructive pulmonary disease ("COPD"). *See id.*

Plaintiff had a high school education and a certificate in welding. (Tr. 37-38). She had past work as a cab driver (Tr. 38), and a machinist (Tr. 39). Plaintiff attended approximately two or three years of college, but dropped out due to poor grades as a result of memory issues. (Tr. 978-79).

---

1. Plaintiff only challenges the ALJ's evaluation of a treating mental health professional, Dr. El-Sayegh. *See* Doc. 12, at 15-18. Therefore, the undersigned only summarizes those records relevant to her arguments. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

2

*2014 Hearing*

At the 2014 hearing, Plaintiff believed that her most limiting impairment was posterior tibial tendon dysfunction in her feet and her cervical stenosis which affected her balance. (Tr. 43-44). Plaintiff also suffered from, *inter alia*, anxiety and depression. (Tr. 51). Plaintiff started mental health treatment in 2012 but believed she "should have been getting treatment for a long [time] before [she] started". (Tr 52). Plaintiff's symptoms included a lack of motivation, decreased energy, appetite fluctuations, and a loss of interest in social interaction. (Tr. 52-53). Plaintiff testified her depression also caused difficulties with concentration and focus, noting she would "disappear" in the middle of conversations. (Tr. 54). By way of example, she described pulling out of a funeral procession because she "forgot what [she] was doing". *Id.*; *see also* Tr. 1005.

Plaintiff also had anxiety. (Tr. 55). She could handle "a little" shopping, but perspired and hyperventilated if the store became crowded or there were children crying nearby. *Id*. She had anxiety attacks approximately two to five times per month. *Id*. At home, Plaintiff's anxiety was triggered by arguments with her son. *Id*.

Plaintiff lived alone. (Tr. 56). On a typical day, she woke around 10:00 a.m. and cared for her dogs and cat. *Id*. Plaintiff's son came over "just about every day" and assisted her with lifting objects and putting away groceries. *Id*. There were days where Plaintiff did not feel like getting out of bed. (Tr. 57).

*2017 Hearing*

At the time of the 2017 hearing, Plaintiff still lived alone, but her son helped with yard work and housework, including cooking and cleaning. (Tr. 980). She drove a car and sometimes made brief grocery store trips. *Id*.

Plaintiff testified that psychiatrist Dr. Brojmohun, and later psychiatrist Dr. El-Sayegh treated her for major depressive disorder and generalized anxiety disorder. (Tr. 999). She attempted suicide in 2011 by ingesting pills (Tr. 1001), which led her to start mental health treatment with Ms. Grippi, a nurse practitioner. (Tr. 1000-01). Plaintiffs mental impairments caused her to stay at home most of the time and affected her ability to concentrate on things such as television or reading. (Tr. 1002-03). Plaintiff had anxiety when around groups of people and did not socialize. (Tr. 1003-05). She had difficulty remembering things and wrote herself reminder notes "all the time". (Tr. 1005). Plaintiff reported trying many different medications and noted she was "kind of stable now", meaning that her depression was unchanged. (Tr. 1001-02).

Relevant Medical Evidence

On December 18, 2011, Plaintiff walked into to the emergency room and reported that she intended to commit suicide by ingesting sleeping pills, but her son had stopped her. (Tr. 334). Plaintiff appeared oriented and cooperative, but had suicidal ideation. *Id*. Providers transferred Plaintiff to Northcoast Behavioral Healthcare ("Northcoast") for inpatient psychiatric care (Tr. 336), where she remained hospitalized for ten days, *see* Tr. 370 (discharge summary).

While at Northcoast, Plaintiff told Rajeet Shrestha, M.D., that she had a "bad few years". (Tr. 370). She cited financial pressures and noted her home was in foreclosure. *Id*. She became increasingly depressed, hopeless and helpless. *Id*. Plaintiff reported no prior psychiatric treatment or psychotropic medications. *Id*. She was cooperative and compliant with treatment. (Tr. 371). Her mood was "still somewhat depressed and fragile" at the beginning of her hospital stay. *Id*. At discharge, Plaintiff was alert and oriented, with regular speech, a "good" mood; euthymic affect, goal-directed thoughts, good insight and judgment, and no suicidal ideation. (Tr. 372). Dr. Shrestha diagnosed depressive disorder (not otherwise specified, rule out major depressive disorder),

4

alcohol dependence, opioid dependence, nicotine dependence, asthma, obesity, and chronic pain; she assigned a Global Assessment of Functioning ("GAF") score of 65[2]. (Tr. 372). She was prescribed several medications on discharge. *Id*.

In January 2012, Plaintiff saw Patricia Grippi, M.S.N., A.P.R.N-B, at Signature Health for a psychiatric evaluation. (Tr. 382). Plaintiff reported depression, chronic pain, reliance on alcohol and street drugs for pain, insomnia, anxiety, fear, loss of interest and motivation, loss of self-esteem, and difficulty concentrating. *Id*. Ms. Grippi observed Plaintiff to be "sloppily dressed" and disheveled. *Id*. Plaintiff had good eye contact and a logical thought process, but never smiled, and had spontaneous pressured speech. *Id*. She denied suicidal ideation, had good concentration and memory, and had fair judgment, knowledge, and insight. *Id*. Ms. Grippi adjusted Plaintiff's medications and referred her for individual counseling and case management. (Tr. 383). Later that month, Plaintiff reported decreased depression with no suicidal thoughts. (Tr. 386). She was taking classes at Kent State University and recently took in her previously-homeless bipolar 23-year-old son. *Id*. Plaintiff reported she "motivated herself enough to clean up a bedroom" in her home for him and was working hard to cope with his irritability and temper. *Id*. On examination, Plaintiff had good eye contact, smiled frequently, and was open with her feelings; she had a logical and organized thought process, good concentration, and fair insight, judgment, and knowledge. *Id*.

---

2. A GAF score is a "clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n.7 (6th Cir. 2006). A GAF score of 61-70 indicates "mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000).

5

In February 2012, Plaintiff returned to Ms. Grippi, reporting she continued to feel depressed, but did not have suicidal thoughts. (Tr. 391). Ms. Grippi found Plaintiff had good eye contact, smiled appropriately, and had spontaneous coherent speech; she had a logical and organized thought process, good concentration and memory, and fair insight, judgment, and knowledge. *Id*. Ms. Grippi stated Plaintiff was "at a plateau with her depression". *Id*.

Plaintiff saw Ms. Grippi again in May 2012. (Tr. 448). She reported improved sleep, but recent nightmares. (Tr. 448). Plaintiff said she felt more outgoing and had "good and bad days". *Id*. She had completed her college finals. *Id*. On examination, Plaintiff was clean and neat, had good eye contact, and smiled; she had spontaneous and coherent speech, and a logical and organized thought process. *Id*. She denied suicidal thoughts. *Id*. Ms. Grippi found Plaintiff "ha[d] demonstrate[d] mild improvement in depressive symptoms" (Tr. 448), and adjusted Plaintiff's medications (Tr. 449). In June, Plaintiff reported things were "better" at home and arguments with her son decreased "a little bit". (Tr. 450). She continued to experience insomnia. *Id*. Plaintiff gardened, walked her dogs daily, and was looking forward to school. *Id*. On examination, Plaintiff was neat and clean, had good eye contact, had spontaneous, coherent, and relevant speech, and a logical thought process; she denied suicidal ideation, and was able to discuss her symptoms with good clarity. *Id*.

In July 2012, Plaintiff reported functioning "quite well" and was focused on becoming more active. (Tr. 451). She tended to her garden daily and was making plans to return to college in the fall. *Id*. Plaintiff continued to report insomnia. *Id*. Ms. Grippi recommended decreasing some of her medications to address the insomnia; Plaintiff said she would "think about [it]". *Id*. Ms. Grippi's examination findings were unchanged from Plaintiff's June visit. *Id*. She found Plaintiff's "acute and chronic risk of harm to self and others is very low at this point". *Id*. In August 2012,

6

Plaintiff reported she had a "hard month" because she lost her home and thus the income from renting it. (Tr. 453). Ms. Grippi observed Plaintiff to be neat and clean with good eye contact, but she did not smile. *Id*. Plaintiff had a logical and organized thought process and denied suicidal ideation. *Id*. In September 2012, Ms. Grippi noted Plaintiff had gained 23 pounds in nine months. (Tr. 455). She observed Plaintiff's risk of self-harm to be "moderate" because of the "self-harm" in her weight gain. *Id*.

Plaintiff saw Emily Brown, M.S.N., A.P.R.N., F.N.P-B.C., in October 2013. (Tr. 727). Plaintiff requested assistance filling out paperwork for "test anxiety". *Id*. Plaintiff brought in a recent college test score where she had 35/100 questions correct; she reported being unable to finish one third of the test. *Id*. She was distracted because she could "hear everything" and felt like the room was "closing in on her" when taking tests. *Id*. Plaintiff reported weight gain, sleep disturbance, a mood disorder, recent psychosocial stressors, and numbness/tingling in her feet. (Tr. 729). Ms. Brown assessed generalized anxiety disorder and major depressive disorder. *Id*. She filled out and submitted Plaintiff's testing paperwork. *Id*.

Plaintiff presented to psychiatrist Archana Brojmohun, M.D., in January 2014. (Tr. 887). Plaintiff reported that she went back to school that week. *Id*. She did not like the winter and the cold, but her mood was "about the same". *Id*. Plaintiff also felt "edgy" but attributed this to the holidays. *Id*. Dr. Brojmohun found Plaintiff had a reserved mood and restricted affect, but also noted a "normal" mental status examination. (Tr. 888). She assessed major depressive disorder (recurrent, moderate), generalized anxiety disorder, panic attacks, alcohol dependence in remission, and opiate abuse in remission. (Tr. 889). She assigned a GAF score of 65. *Id*. During her treatment of Plaintiff from January 2014 through September 2015, Dr. Brojmohun frequently described Plaintiff's mental status as "normal" (Tr. 882, 876, 869, 2007, 1986, 1976, 1965-66),

7

while also noting her affect was "restricted" (Tr. 882, 876, 869, 2007, 1996, 1986, 1965-66), and her mood was "depressed" or "reserved" (Tr. 876, 869, 2007, 1996, 1986, 1976, 1965-66).

In March 2014, Plaintiff reported she was "feeling better". (Tr. 881). She noted she was frustrated and "not really getting along with her neurologist because she is not getting any opinion from her." *Id*. Plaintiff reported the weather affected her mood, as did her son because he was bipolar and unmedicated. *Id*.

Plaintiff returned to Dr. Brojmohun in May 2014, reporting that she recently finished her semester and planned to take summer and fall classes. (Tr. 874). She stated her depression was "okay" and she was "doing well" on medications. (Tr. 875).

In June 2014, Plaintiff was "doing okay" and her depression was "about the same as last time". (Tr. 868). Plaintiff thought she was sleeping too much, and sometimes felt hopeless and helpless. *Id*.

Plaintiff returned to Dr. Brojmohun in December 2014. (Tr. 2005). Plaintiff reported that she was not feeling physically well, and she kicked her son out of her home two months prior. *Id*. Plaintiff reported school was not going well and her depression was "all right". *Id*.

In June 2015, Dr. Brojmohun noted Plaintiff missed a lot of appointments. (Tr. 1994). Plaintiff reported that she "[felt] that she can't get anything done" and she "loses track of time". *Id*. Dr. Brojmohun noted Plaintiff's mental status exam was "Abnormal: depressed." (Tr. 1996). In July, Plaintiff reported she was "trying to get motivated", but her depression was still present. (Tr. 1984). In August, Plaintiff reported her depression was "a lot better". (Tr. 1974).

At her final visit with Dr. Brojmohun in September 2015, Plaintiff reported "doing well" but she did not want Dr. Brojmohun to leave the practice. (Tr. 1964). Plaintiff's son was moving back in with her and she was nervous. *Id*. Her depression continued. *Id*. Throughout treatment, Dr.

Brojmohun continued Plaintiff's diagnoses (Tr. 882, 876, 870, 2008, 1996, 1966), and adjusted her medications (Tr. 870, 877, 889, 1997).

Psychiatrist Samar El-Sayegh, M.D., took over Plaintiff's psychiatric care from Dr. Brojmohun in May 2016. (Tr. 2059). Plaintiff reported her anxiety was "getting the best of [her] lately". *Id*. She felt "down" and had poor energy and motivation. (Tr. 2060). Plaintiff expressed thoughts of suicide but no plan. *Id*. On examination, Plaintiff's behavior was organized and cooperative; she had a "down" mood, full affect, organized thoughts, and adequate judgment. (Tr. 2063). Dr. El-Sayegh diagnosed generalized anxiety disorder, major depressive disorder (recurrent, moderate), and panic attacks. (Tr. 2064). In August, Plaintiff reported she was not as anxious, nor as depressed, but it was "still there". (Tr. 2048-49). On examination, Plaintiff had an "okay" mood and a constricted affect. (Tr. 2052).

In January 2017, Plaintiff returned to Dr. El-Sayegh and reported feeling "alright" since her last visit. (Tr. 2037). She had poor motivation but attributed that to the season. *Id*. ("feels blah in winter"). She believed her medications were effective and she had fewer panic attacks. *Id*. On examination, Plaintiff had a "good" mood and constricted affect. (Tr. 2041). In March 2017, Plaintiff reported feeling "alright then . . . fairly crappy lately". (Tr. 2026). On examination, Plaintiff had a "crappy" mood and blunted affect. (Tr. 2030). Throughout treatment, Dr. El-Sayegh continued Plaintiff's diagnoses (Tr. 2053, 2042, 2030-31), and adjusted her medications (Tr. 2030-31).

Opinion Evidence

In May 2012, Ms. Grippi completed a mental functional capacity assessment. (Tr. 834-38). She opined Plaintiff was not significantly limited in her ability to remember locations and work procedures; understand, remember, and carry out short simple instructions; make simple work-

9

related decisions; ask simple questions; request assistance; get along with coworkers or peers without distracting them; maintain awareness of normal hazards and take precautions; and travel in unfamiliar places. (Tr. 834). She found Plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; adhere to basic standards of cleanliness; respond appropriately to changes in the workplace; and set realistic goals. *Id*. Ms. Grippi found Plaintiff markedly limited in her ability to maintain attention and concentration for extended periods; perform activities on a schedule; maintain regular attendance; or complete a normal workday without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number of rest periods. *Id*. Ms. Grippi opined Plaintiff was "unemployable". *Id*.

In July 2014, Dr. Brojmohun completed an assessment of Plaintiff's mental ability to conduct work-related activities. (Tr. 895-96). She opined Plaintiff had marked[3] limitations in her ability to relate to other people; activities of daily living; degree of deterioration in her personal habits; ability to sustain a routine without supervision; ability to perform on a schedule and maintain regular attendance; ability to understand, remember, and carry out instructions; and use good judgment. *Id*. She had a moderate[4] limitation in her ability to perform simple tasks. (Tr. 896).

---

3. The form defines "marked" as a "[s]erious limitation, severely limits ability to function (i.e. on task 48%-82% in an 8 hr work day)." (Tr. 895).

4. The form defines "moderate" as a "[s]ignificant limitation (i.e. on task 82%-88% in an 8 hr work day)." (Tr. 895).

10

Further, she found Plaintiff had extreme[5] limitations in her ability to maintain concentration and attention for extended periods; respond appropriately to supervision, coworkers, customary work pressures, and changes in the work setting; perform complex, repetitive, or varied tasks; and behave in an emotionally stable manner. (Tr. 895-96). Dr. Brojmohun opined Plaintiff's condition was likely to deteriorate if she was placed under job-related stress. (Tr. 896). She found Plaintiff would likely be absent approximately two days per month. *Id*. Dr. Brojmohun checked a box indicating she could not confirm that the severity of Plaintiff's limitations existed since June 1, 2009, explaining: "[Plaintiff] started treatment with me on 9-3-2013". *Id*.

In June 2017, Ms. Brown completed an "Off-Task/Absenteeism Questionnaire", wherein she opined Plaintiff would be off task at least twenty percent of the time and likely absent three times per month. (Tr. 2302). She also found Plaintiff would only be able to work four hours per day due to her physical and mental limitations. (Tr. 2303).

In July 2017, Dr. El-Sayegh completed three disability questionnaires. First, in an "Off-Task/Absenteeism Questionnaire", she opined Plaintiff would be off task at least twenty percent of the time and likely be absent three times per month. (Tr. 2307). She indicated the severity of Plaintiff's limitations existed prior to December 31, 2014. *Id*. Next, in a "Medical Statement Concerning Depression, Bipolar, and Related Disorders", she opined Plaintiff had no limitation in her ability to interact with others; a mild (slight) limitation in her ability to adapt or manage herself; and a moderate (fair) limitation in her ability to understand, remember, and apply information; and maintain concentration, persistence, or pace. (Tr. 2308). Finally, in a "Medical Statement Concerning Anxiety and Obsessive Compulsive Disorders", Dr. El-Sayegh wrote "same as above"

---

5. The form defines "extreme" as a "[m]ajor limitation with no useful ability to function (i.e. on task 0% - 48% in an 8 hr work day)." (Tr. 895).

11

referencing the limitations provided on the depression and bipolar disorder questionnaire. (Tr. 2309).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 1009-17. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. (Tr. 1011-12). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a marker, garment sorter, or a linen grader. (Tr. 1012-13).

ALJ Decision

In a written decision dated August 31, 2017, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2014 and had not engaged in substantial gainful activity from her alleged onset date (June 1, 2009), through her date last insured. (Tr. 944). She concluded Plaintiff had severe impairments of obesity; degenerative disc disease, asthma, an affective disorder, anxiety disorder, and substance addiction disorder, *id.*, but found these impairments (alone or in combination with any other) did not meet or medically equal the severity of a listed impairment (Tr. 945). The ALJ then set forth Plaintiff's residual functional capacity ("RFC") through her date last insured:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: she can never climb ladders, ropes or scaffolds; frequently kneel, crouch, and crawl; she must avoid concentrated exposure to the extremes of cold and heat, and concentrated exposure to humidity, fumes, odors, dusts, gases and poor ventilation; avoid concentrated exposure to hazards such as industrial machinery and unprotected heights; she has the ability to perform simple repetitive tasks in a workplace without a fast pace or strict daily quota requirements with no more than brief superficial interaction with the general public, co-workers and supervisors.

(Tr. 947). The ALJ found Plaintiff was unable to perform past relevant work; was defined as a "younger individual" on the date last insured; and had a high school education. (Tr. 952). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id*. Thus, the ALJ found Plaintiff not disabled from June 1, 2009 (the alleged onset date), through December 31, 2014 (the date last insured). (Tr. 953).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises one objection to the ALJ's decision – that she did not properly consider the medical opinion of treating psychiatrist Dr. El-Sayegh. (Doc. 12, at 15-18). The Commissioner

responds that the ALJ's decision is supported by substantial evidence. (Doc. 13, at 5-11). For the following reasons, the undersigned recommends the decision be affirmed.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[6] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the

---

6. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, the ALJ addressed Dr. El-Sayegh's opinion together with that of Ms. Brown, and explained why she assigned "no weight" to each opinion:

> The undersigned accords no weight to the opinions of Emily Brown DNP, and Dr. El-Sayegh, M.D. at Exhibits 54F and 53F. Both providers opined that the claimant would be off task three times per month since prior to her date last insured (exhs. 54F, 54F [sic]). Ms. Brown also opined that the claimant would frequently need to elevate legs, and, among other things, that the claimant can only work four hours per day (exh. 53F p.3). Although Ms. Brown indicates that her opinion applies for the period prior to the claimant's date last insured, her treatment records do not support such a limitation. Furthermore, Dr. El-Sayegh acknowledges that he did not establish a treating relationship with the claimant until May 2016, but rather his clinic had been treating the claimant prior to that date. Treatment records from the clinic do not support the level of need for absence as indicated by Dr. El-Sayegh prior to the date last insured (exh. 54F p.3). Furthermore, Dr. El-Sayegh opined that the claimant has a minimal capacity to adjust to changes in her environment or setting (exh. 54F p.3). This is simply not consistent with the claimant's statements to providers and her testimony regarding her abilities prior to her date last insured.

(Tr. 951-52).

The Commissioner suggests that any error in the ALJ's analysis of Dr. El-Sayegh's opinion is harmless because the opinion was written nearly three years past Plaintiff's date last insured. (Doc. 13, at 5-6). The Commissioner specifically notes that "'[e]vidence of disability obtained after the expiration of insured status is generally of little probative value', unless the evidence relates back to the relevant period." *Id.* at 5 (quoting *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004)); *see also Smith v. Astrue*, 2009 WL 4930893, at *3 (E.D. Ky.) ("[A]n ALJ has a duty to consider subsequent medical evidence of a plaintiff's condition after his date last

16

insured to the extent the evidence is relevant to the plaintiff's condition preceding the date last insured.") (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). Here, Plaintiff's treatment relationship with Dr. El-Sayegh represented a direct continuation of her care from that of Dr. Brojmohun. (Tr. 2059). The two providers were at the same practice, and Plaintiff's treatment continued uninterrupted with a new provider after her primary physician left. Thus, the undersigned finds that Dr. El-Sayegh could offer an opinion about Plaintiff's condition prior to her date last insured. *See* Tr. 2307-08 (indicating the opined limitations existed prior to December 31, 2014).

Alternatively, the Commissioner argues that even if the opinion relates back, the ALJ's analysis is still supported by substantial evidence. (Doc. 13, at 7-8). It is the Commissioner's second argument which has merit. As noted above, Dr. El-Sayegh took over Plaintiff's psychiatric care in May 2016 after Dr. Brojmohun left the practice. Tr. 2059; *see also* Tr. 2310 (Dr. El-Sayegh's opinion noting she personally began treating Plaintiff in May 2016, but her practice had treated Plaintiff since September 2013). The ALJ found the Plaintiff's treatment records prior to her date last insured from within the practice (from Dr. Brojmohun) did not support the extreme limitations opined by Dr. El-Sayegh. (Tr. 951-52). This is supported by the record. As the ALJ explained further in her analysis of Dr. Brojmohun's July 2014 opinion:

> Although [s]he is one of the claimant's treating physicians, Dr. Brojmohun's opinion is simply not supported by the objective evidence, including his [sic] own treatment notes. The claimant has frequently demonstrated a normal mood and affect (exhs. 2F, 3F, 6F, 18F). Her attention and concentration have also been good (exhs. 2F, 3F, 18F). In addition, the claimant has been able to study occupational therapy at least part-time (exhs. IF, 3F, 4F, 6F, 18F, 21F, 25F). Furthermore, Dr. Brojmohun herself assessed the claimant with GAF scores ranging from 60 to 70, thereby indicating the claimant would likely experience only mild to moderate symptoms (exhs. 25F, 26F).

17

(Tr. 951). Here, the ALJ referenced treatment notes where Plaintiff demonstrated "a normal mood and affect" *id*. (citing exhibits containing Tr. 372, 670), and "good" attention and concentration *id*. (citing exhibits containing Tr. 382, 386, 391, 440, 442, 444) (noting Plaintiff had "good" concentration and memory). Dr. Brojmohun also frequently noted "normal" mental status examinations, *see* Tr. 869, 876, 882, 888, 1965, 1976, 1986, 2007, and assigned Plaintiff a GAF-score of 65 (Tr. 889). The ALJ further cited Plaintiff's ability to study at Kent State. (Tr. 951) (citing exhibits containing Tr. 386, 448, 451, 874). The ALJ also found Dr. El-Sayegh's opinion that Plaintiff had a "minimal capacity" to adjust to changes in her environment inconsistent with Plaintiff's testimony and statements she made to providers. (Tr. 952); *see* Tr. 55 (Plaintiff's testimony that she grocery shopped); Tr. 57 (Plaintiff's testimony that she engaged in minor household chores); Tr. 1001 (Plaintiff's testimony that she was "kind of stable" after finding the right medication); Tr. 451 (Plaintiff's statement to Ms. Grippi that she was doing "quite well" and tended her garden daily); Tr. 881 (Plaintiff's statement to Dr. Brojmohun that she was "feeling better"); Tr. 875, 868 (Plaintiff's statements to Dr. Brojmohun that she was doing "okay"); Tr. 875 (Plaintiff's statement to Dr. Brojmohun that she was "doing well" on her medications). The evidence cited here by the ALJ is substantial and provides good reasons for her decision to assign "no weight" Dr. El-Sayegh's opinion. (Tr. 951). Plaintiff's assertion that the ALJ erred by making a "blanket citation to the record as a whole" when discounting the opinion is unsupported. (Doc. 12, at 17). As the Commissioner correctly argued in response (Doc. 13, at 8-9), the ALJ here rightly addressed the factors of supportability and consistency when weighing the evidence as required and, as identified above, provided record support. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). Thus, the undersigned finds no error and recommends the decision be affirmed.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

s/ James R. Knepp II<br>
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).